El Pueblo de Puerto Rico, demandante y apelado, *v.* Narciso Gómez, acusado y apelante.

No. 4886.—*Sometido:* Febrero 14, 1934. *Resuelto:* Julio 26, 1934.

*R. Martínez Nadal* y *F. Navarro Ortiz,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

El Juez Asociado Señor Hutchison, emitió la opinión del tribunal.

Durante doce años Narciso Gómez formó parte de la fuerza policíaca de Santo Domingo, donde ascendió hasta el grado de capitán, y en varios cargos se le encomendaron deberes de considerable importancia y responsabilidad. Luego, después de variada experiencia en los negocios, que terminaron en quiebra, vino a Puerto Rico y empezó una nueva vida como contrabandista de licores. Declara él que se dedicaba a este negocio con alguna discreción y todo respeto a la autoridad. Fué juzgado dos veces por el delito de asesinato, convicto finalmente de homicidio y sentenciado a tres años de presidio.

Natividad Rodríguez era una mujer indigente con una niña en los brazos cuando Narciso Gómez la conoció y constituyó para ella un hogar, en que vivieron juntos. Luego

puso una de las niñas de ella en una institución conocida por Robinson School, donde recibiría instrucción adecuada y los beneficios de una educación. Una sirvienta declara que en cierta ocasión en que Gómez se preparaba para salir de la casa por varios días hubo algo como un disgusto doméstico. Después que Gómez se fué de viaje, Natita también salió de la casa y regresó más tarde, el mismo día, acompañada de Oscar Morales, un soldado, quien permaneció allí desde el lunes hasta el miércoles por la noche. En el ínterin Natita le dijo a la sirvienta que lavara en la casa la ropa de Oscar. Natita parece haber conocido a Morales antes que a Gómez, más nada hay que demuestre que después de ser la concubina de Gómez hubiese continuado o reanudado sus relaciones con Morales con anterioridad a la visita de tres días que él le hizo.

El lunes siguiente a la visita de tres días de Morales, Gómez se llevó a Natita, a la sirvienta y a las dos niñitas de paseo a Humacao y Naguabo. Regresaron entre ocho y nueve de la noche y se detuvieron en la parte posterior de la casa, donde sacaron del automóvil un número de maletas y paquetes y los pusieron en el balcón de la parte de atrás de la casa. En dicho balcón también había otro bulto que al ser tomado y examinado por la sirvienta se halló que contenía ropa sucia de Morales. Gómez preguntó respecto al contenido del aludido bulto pero recibió una respuesta evasiva y no insistió en una contestación categórica. En cambio dió la vuelta hasta llegar a la puerta delantera, por la que entró y pasó por el interior de la casa a fin de abrir la puerta trasera por dentro. Entonces volvió hacia el frente de la casa, donde había dejado la llave en la cerradura de la puerta de entrada. Más o menos en este momento el *chauffeur* vió a un hombre parado detrás del automóvil. Cuando este hombre vió que el *chauffeur* salía de la puerta trasera, abandonó la posición que ocupaba detrás del carro y se situó frente a la casa. Hubo algo en la actitud o conducta de este hombre que hizo que el *chauffeur* diera marcha al automóvil y le siquiera hasta un punto cercano a la esquina del frente de la

casa, donde detuvo el carro. Mientras se hallaba allí oyó voces dentro de la casa, pero no pudo entender lo que se decía debido al ruido producido por el motor. Luego oyó el ruido producido por una lucha que fué seguida por un número de detonaciones, la primera de las cuales rompió el cristal de la puerta del frente. El *chauffeur* y el automóvil habían sido contratados únicamente para hacer el viaje. Al oír el primer disparo, el *chauffeur* se agachó en el asiento del automóvil hasta que terminaron los disparos, corrió entonces hacia su casa, informó del incidente a su esposa y regresó más tarde a la escena de los disparos, donde declaró ante el juez municipal y ante un cabo de la Policía Insular que habían llegado y practicaban la investigación.

Gómez dice que mientras sacaba la llave de la puerta de enfrente oyó pasos detrás de él, se viró y se halló frente a frente con Morales, quien le dijo en tono imperativo que deseaba hablarle; que el testigo le contestó ''¿Qué quiere usted?''; que Morales empezó a decirle algo que él no entendía y debido al tono poco respetuoso en que se expresaba, el declarante le dijo algo y luego se volvió para entrar a la casa; que Morales le siguió y cuando él oyó que éste penetraba en la sala, el testigo se viró nuevamente y antes de que él pudiera hablar, Morales, que ya se encontraba dentro de la casa a unos dos pies de distancia del umbral, le dió el primer golpe; que el testigo cayó contra la *victrola* y al recobrar el equilibrio y tratar de devolver el golpe, su puño chocó con un objeto duro; que el declarante no sabía si se trataba de algo que Morales tenía en la mano o de alguna otra cosa; que Morales se adelantó hacia el testigo con el propósito de agarrarle y el testigo se volvió, penetró en una habitación contigua, cogió una pistola que había en una mesita junto a la puerta y entonces disparó; que se trataba de una pistola automática que continuaba disparando mientras hubiera balas en el peine, a menos que se aflojara el gatillo, cosa que el testigo no hizo por el estado en que se encontraba.

Dolores Rodríguez, la sirvienta, declaró que mientras ella

sacaba el último de los paquetes del balcón trasero de la casa oyó una detonación; que ella soltó el paquete, penetró en la casa y vió a Gómez y Morales empuñados a la entrada de la casa; que cayeron para adentro, Morales debajo y Gómez encima; que Gómez entonces se levantó, sacó su pistola e hizo un número de disparos contra el cuerpo exánime de Morales, quien no levantó más del suelo; que Morales estaba tendido con los pies hacia la puerta.

Rafael Nadal, quien vivía al lado opuesto de la calle, que oyó los disparos y que inmediatamente fué a ver lo ocurrido, declaró que vió a Gómez sentado en una butaca con un chichón en la frente; que el cristal de la puerta de enfrente estaba roto; que la puerta estaba entrejunta; que durante la tarde del mismo día el cristal estaba intacto; y que los disparos se habían hecho sucesivamente.

El cabo de la policía que llegó a la escena del suceso en unión del juez municipal poco después de los disparos, declaró que Gómez tenía una contusión en la frente; que el cristal en la puerta de enfrente estaba roto y que ciertos desconchados en la balaustrada de concreto del balcón de enfrente aparecían haber sido hechos por balas.

Las heridas que presentaba el cuerpo de Morales fueron todas de balas que penetraron por el frente y algunas le atravesaron el cuerpo totalmente. La espalda de la chaqueta que Morales usaba en el momento en que se hicieron los disparos estaba perforada por tres sitios. La declaración de la sirvienta respecto al intervalo que había mediado entre el primer disparo y los siguientes está contradicha por el testimonio del *chauffeur,* así como por el de Nadal.

Un médico que examinó a Gómez poco después de los disparos, halló que en adición al golpe en la frente, presentaba una contusión fuerte en la espalda y una rasgadura cerca de las articulaciones de la mano derecha. Declaró además que Gómez era un hombre como de sesenta años, que padecía de nefritis crónica, así como de un endurecimiento general de las arterias; y que un golpe lo suficientemente violento para

haber producido el chichón que tenía en la frente hubiese bastado para tirarle al suelo o hacia atrás contra un mueble.

Los autos están plagados de persistentes sugestiones e insinuaciones de que Natividad Rodríguez era o había sido una prostituta. El fiscal trajo a la luz durante la repregunta que Gómez había dejado una esposa y familia en Santo Domingo. Su declaración demuestra, sin embargo, que había regresado a Santo Domingo en varias ocasiones luego de venir a Puerto Rico y nada hay que demuestre que su esposa y familia en Santo Domingo no fueran atendidas. Gómez también admitió durante la repregunta que había sido acusado en dos ocasiones ante la Corte Federal por supuestas infracciones a la Ley Volstead. Dijo que había sido absuelto del primer delito y que en el segundo caso había sido sentenciado a pagar una multa de $350 y las costas. Hubo mucha más prueba respecto a estas cuestiones que sobre la muerte misma. Estos distintos aspectos del caso pueden haberse combinado para prejuzgar al acusado ante los ojos del jurado pero ninguno de ellos—ni todos ellos—le privaron de su derecho a la defensa propia. La casa que construyó y regaló a su concubina continuaba siendo la casa en que vivía como jefe y cabeza de la misma. Era su hogar y su castillo, no obstante el hecho de que el título legal de la misma había pasado a Natividad Rodríguez. Tenía perfecto derecho a ordenarle a Morales que saliera de la casa y a lanzarle de la misma a la fuerza, si ello era necesario.

El hecho de que Natividad Rodríguez tuviera el título legal de la casa y solar, en unión al hecho de las relaciones establecidas entre Natividad Rodríguez y Morales durante la ausencia reciente de Gómez, tomados en conexión con las circunstancias inmediatamente anteriores a la solicitud de una entrevista, arrojan alguna luz sobre el testimonio de Gómez respecto a la actitud agresiva de Morales. La declaración de Gómez sobre lo ocurrido en el interior de la casa, de ser cierta, establece un caso claro de legítima defensa. Su testimonio es contradicho únicamente por el de la sirvienta.

Su declaración es negativa y anulada por el hecho significativo de que no se hallaron agujeros de bala ni señas que pudieran haber sido producidas por las mismas en el suelo o en algún otro sitio dentro de la habitación. El número y la naturaleza de las heridas recibidas por Morales prácticamente eliminan la posibilidad de cualquier teoría de que después de recibirlas, él pudiera haber dado el golpe que produjo las contusiones a Gómez. Si eliminamos el testimonio de la sirvienta, la declaración de Gómez es enteramente consistente con todos los otros hechos y circunstancias del caso.

Podría admitirse que Gómez tuviera mal carácter. Podría admitirse que la prueba no excluye la teoría de homicidio como una posibilidad razonable; podría aun admitirse que la teoría de homicidio es tan plausible y probable como la teoría de defensa propia, pero ello no basta para sostener un veredicto y una sentencia condenatoria. El artículo 236 del Código de Enjuiciamiento Criminal lee así:

"En todo proceso criminal, se considera inocente al acusado mientras no se pruebe lo contrario, y en caso de existir duda razonable o fundada acerca de su culpabilidad, se le absolverá."

A menos que esa disposición estatutaria se haya convertido o se convierta en letra muerta que merezca más ser violada que cumplida, entonces *la sentencia apelada debe ser revocada y archivarse la causa.*

Los Jueces Asociados Señores Wolf y Aldrey disintieron.*